UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MULTIMATIC, INC.,
a Canadian corporation,

      Plaintiff/Counter-Defendant,      Case No. 05-60120

v.                                     Hon. John Corbett O'Meara

FAURECIA INTERIOR SYSTEMS
USA, INC., a Delaware corporation,

      Defendant/Counter-Plaintiff.

_____/

### OPINION AND ORDER

Before the court are the parties' motions for summary judgment, which were filed on

January 16, 2007, and have been fully briefed.  The court heard oral argument on February 8,

2007, and took the matter under advisement.

### BACKGROUND FACTS

This is a contract dispute between two auto suppliers.  Plaintiff Multimatic worked with

Defendant Faurecia to design and manufacture an instrument panel for DaimlerChrysler

vehicles.  Specifically, Multimatic designed a cross-beam, which was a component of the

instrument panel that Faurecia supplied to DaimlerChrysler.

### A.      The Confidentiality Agreement

In early 2004, Faurecia selected Multimatic to supply the cross-beam.  Multimatic

contends that it was difficult to engineer the cross-beam to Faurecia and DaimlerChrysler's

exacting specifications.  Multimatic declined to share its designs with Faurecia until the parties

executed a Confidentiality Agreement.  Multimatic wanted to protect its designs and technical

information from disclosure, particularly to competitors.  In February 2004, Multimatic and

Faurecia signed a Confidentiality Agreement.  The Agreement provides:

> Each of Multimatic, Venture and Faurecia possesses proprietary
> confidential information pertaining to its business and customers
> and possesses technical information relating to its products,
> designs and services, including compositions, raw materials,
> formulations, additives, components, production processes, plant
> layout, engineering concepts and designs, analysis models and
> results, know-how, and other intellectual and industrial property,
> which is generally not available to the public (. . . "Sensitive
> Information"). . . .
>
> All Sensitive Information of a disclosing party and all rights
> thereto shall remain the exclusive property of the disclosing party
> and shall be held in trust by the receiving party for the disclosing
> party.

Pl.'s Ex. 20.  The Agreement further provides that the parties will keep Sensitive Information

confidential and not disclose it to any third party.  Id.  The Agreement included a signature line

for a third company, Venture.  Soon after the Agreement was drafted, however, it became clear

that Venture was not going to participate in the project.  Multimatic did not pursue Venture's

signature to the Agreement and did not disclose any of its designs or Sensitive Information to

Venture.

After the Confidential Agreement was signed by Faurecia, Multimatic submitted its

initial design for the cross-beam.  Multimatic contends that this initial proposal constituted

Sensitive Information as defined and protected by the Confidentiality Agreement.  In June 2004,

Faurecia sent Multimatic's cross-beam design to Multimatic's competitors without Multimatic's

knowledge or consent.  Faurecia disclosed Multimatic's design for the purpose of conducting a

"market test" to determine if the cross-beam could be manufactured more cheaply.  Faurecia did

a second market test in October 2004, again without Multimatic's knowledge or consent.

Multimatic submitted what it considered to be an innovative new design for the cross-

beam to Faurecia, known as the "Mass Saving Design," in November 2004.  In December 2004, Faurecia approved the Mass Saving Design from an engineering perspective.  In April 2005, Faurecia conducted a third market test by sending Multimatic's Mass Saving Design to at least three of Multimatic's competitors.

Soon thereafter, Faurecia obtained a lower price quote for the manufacture of the cross-beam from one of Multimatic's competitors, Brown Corporation.  Faurecia demanded a price reduction from Multimatic, to no avail.  Faurecia then awarded the cross-beam program to Brown.  Faurecia subsequently provided Brown with additional Sensitive Information that belonged to Multimatic, including CAD designs, CAE models and analysis, Multimatic's Design Failure Mode and Effects Analysis, its Design Verification Plan & Report, and a prototype cross-beam manufactured by Multimatic.  Multimatic contends that Faurecia's disclosure of this information and other information through market tests violated the Confidentiality Agreement.

### B.   The Letter of Intent

Multimatic alleges that, before it submitted its Mass Savings Design to Faurecia in November 2004, it insisted on a firm sourcing commitment.  According to Multimatic, Faurecia had always verbally represented that Multimatic would be the production source for the cross-beam, not just the designer.  Multimatic contends that it was unwilling to share its Mass Savings Design with Faurecia until it received a sourcing commitment.  According to Multimatic, that commitment came in the form of a Letter of Intent executed on November 16, 2004.  See Pl.'s Ex. 6, Def.'s Ex. B.  The Letter of Intent provides, in part:

> On behalf of Faurecia Interior Systems, I am pleased to inform you that Multimatic has been selected as the Pre-Development supplier for the part listed below [cross-beam].  This decision is based on your Initial Quote . . . Dated April 7, 2004. . . .

The price level for this program is as follows:

    • Piece price: $22.7753 Ex. Works

    * * *

Jeff Stull will distribute the production LOI for this package. The
LOI will cover the final pricing level of all negotiated engineering
changes incremental to the above pricing. In addition the LOI will
contain the SOR, Quality Agreement and General Terms of
Purchase and other pertinent program deliverables.

In the event Multimatic fails to meet the applicable quality,
delivery, and product launch standards that are expected during
production, Faurecia has the right to quote and source alternative
production suppliers. In this case, Multimatic will be compensated
for design and development efforts completed.

Id.

      After receiving the Letter of Intent, Multimatic uploaded its Mass Savings Design to the

DaimlerChrysler VPM system, which is a computer network that allows suppliers to share

information. Although DaimlerChrysler's computer system administrator has access to all files

on the system, the suppliers otherwise control who has access to their information. Multimatic

contends that it only granted Faurecia access to its information on the VPM system.

      Multimatic contends that in April 2005, apparently after conducting a market test with its

Mass Savings Design, Faurecia demanded price concessions from Multimatic. Multimatic

asserts that it was willing to negotiate engineering changes, but that Faurecia wanted to disregard

the Letter of Intent and renegotiate the price of the part from $0. Multimatic also claims that

Faurecia demanded that Multimatic pay it $200,000 if Multimatic wanted to remain the cross-

beam supplier. When Multimatic refused to meet Faurecia's demands for a price reduction and

"kick-back," Faurecia awarded the cross-beam contract to Brown. Multimatic contends that, in

-4-

doing so, Faurecia violated the Letter of Intent.

   **C.**   **Procedural History**

   Multimatic filed its complaint on May 25, 2005, alleging the following causes of action:

Count I, breach of Confidentiality Agreement; Count II, anticipatory repudiation of

Confidentiality Agreement; Count III, specific performance of Confidentiality Agreement; Count

IV, breach of Letter of Intent; and Count V, breach of prototype protective orders.  See Amended

Complaint (filed June 30, 2005).  Multimatic sought a preliminary injunction, which the court

denied on August 1, 2005, essentially because Multimatic failed to demonstrate irreparable

harm.

   Faurecia filed a counterclaim, alleging the following causes of action: Count I, breach of

purchase orders; Count II, breach of contract; Count III, breach of implied covenant of good

faith and fair dealing; Count IV, tortious interference with contractual relations; Count V,

tortious interference with economic relations; Count VI,  anticipatory repudiation; and Count

VII, unauthorized use of intellectual property.

   Multimatic has filed two summary judgment motions, one for judgment in its favor on

Count I of its complaint (breach of the Confidentiality Agreement) and one for judgment on

Faurecia's counterclaims.  Faurecia has also filed a motion for summary judgment, seeking

judgment on Counts I - IV of Multimatic's complaint.

## LAW AND ANALYSIS

   **A.**   **Standard of Review**


   Summary judgment is appropriate if "there is no genuine issue as to any material fact and

. . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When

reviewing a motion for summary judgment, the facts and any reasonable inferences drawn from

the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The party opposing summary

judgment, however, must present more than a "mere scintilla" of evidence; the evidence must be

such that a reasonable jury could find in favor of the plaintiff. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 252 (1986).

### B.   Contract Interpretation

Under Michigan law, "the main goal in the interpretation of contracts is to honor the

intent of the parties." Mahnick v. Bell Co., 256 Mich. App. 154, 158-59, 662 N.W.2d 830

(2003).[1]

> The court must look for the intent of the parties in the words used
> in the contract itself. When contract language is clear,
> unambiguous, and has a definite meaning, courts do not have the
> ability to write a different contract for the parties, or to consider
> extrinsic testimony to determine the parties' intent. The
> determination of whether contract language is clear and
> unambiguous is a question of law. If a contract is subject to two
> interpretations, factual development is necessary to determine the
> intent of the parties and summary disposition is inappropriate.
> When contractual language is clear, its construction is a question
> of law for the courts. Courts must not create ambiguity where it
> does not exist. If the meaning of the language is unclear, the trier
> of fact must determine the intent of the parties.

Id. (citations omitted).

---

[1] The Agreement contains a choice of law clause stating that it is governed by the laws of
Ontario, Canada. Faurecia contends that the Agreement is not binding and that, based upon
Michigan's choice of law rules, Michigan law applies. Multimatic does not dispute that
Michigan law applies and contends that, in any event, the elements of a contract claim are the
same under Ontario and Michigan law.

-6-

C.    **The Confidentiality Agreement**

Faurecia claims that the Confidentiality Agreement is not enforceable and that, even if it is enforceable, Faurecia did not breach it.   First, Faurecia argues that the Confidentiality Agreement is not binding because Venture did not sign it.   According to Faurecia, the plain language of the Agreement conditions the disclosure of "Sensitive Information" "[u]pon execution of this Agreement by all parties. . . ."   Faurecia does not dispute, however, that Venture ultimately had nothing to do with the cross-beam project and that Multimatic did not disclose its Sensitive Information to Venture.   Faurecia also does not explain how its ability to perform under the Confidentiality Agreement was affected by Venture's failure to sign.

Moreover, the law does not invalidate the Confidentiality Agreement simply because all parties did not execute it.   Rather, "those who do sign the writing may have intended to be bound by its terms even though less than all the named persons sign.   Their intention governs.   The intention of the parties is a fact to be decided upon the evidence, not by invoking our personal, professional or judicial experience." Wiegand v. Tringali, 22 Mich. App. 230, 234, 177 N.W.2d 435 (1970).   Further, "[w]here there are multiple parties to a contract, a signatory has the burden of proving that it was the intent of all of the parties that none would be bound unless all signed." Earl Dubey & Sons, Inc. v. Macomb Concrete Corp., 81 Mich. App. 662, 673, 266 N.W.2d 152 (1978).

Although the intent of the parties is often a question of fact, Faurecia has not set forth evidence that it was the intent of all parties that none would be bound unless all signed the Confidentiality Agreement.   The evidence suggests that Multimatic certainly expected that Faurecia intended to be bound, or Multimatic would not have shared its confidential designs.   The evidence also suggests that Faurecia thought it was bound by the Agreement, because it shopped around

Multimatic's designs without informing Multimatic.  A review of all the evidence demonstrates that Faurecia has not met its burden of establishing that its signature to the Confidentiality Agreement did not bind it.

Faurecia's second argument is that no agreement was formed because it lacked consideration. That is, because Venture did not participate and disclose its "Sensitive Information," "there was a failure of consideration."  However, in exchange for receiving Multimatic's Sensitive Information, Faurecia agreed to keep that information confidential.  There was a bargained-for exchange and, therefore, legally sufficient consideration.  See General Motors Corp. v. Department of Treas., 466 Mich. 231, 239, 644 N.W.2d 734 (2002) ("It has been said '[a] cent or a pepper corn, in legal estimation, would constitute a valuable consideration.'") (citation omitted).

Faurecia's third argument is that it did not breach the Confidentiality Agreement because "Sensitive Information" does not encompass "proprietary information created from and after execution of the document" or "foreground technology."  Faurecia contends that the Agreement covers information in existence at the time it was executed and does not cover any information developed by the parties in pursuit of their work on the cross-beam.  Faurecia also asserts that ownership of the designs was to be transferred to DaimlerChrysler.

The Confidentiality Agreement does not, expressly or implicitly, exclude "foreground technology" from coverage.  Faurecia's interpretation is without support in the language of the Agreement.  Further, Multimatic contends, and Faurecia does not dispute, that some of the Sensitive Information conveyed was "background technology" that the parties agree is covered under the Agreement.  Although Faurecia contends that the cross-beam design would ultimately be the property of DaimlerChrysler, Faurecia has not demonstrated that Multimatic agreed to surrender

-8-

ownership of its designs and other technical information at the time Faurecia did its market tests and chose another supplier.

Faurecia's fourth argument is that Multimatic waived its rights under the Confidentiality Agreement by uploading its designs to the DaimlerChrysler Virtual Product Manager ("VPM") system.  However, Multimatic contends that Faurecia was the only party (other than the system administrator) who was granted access to view Multimatic's designs on the VPM.  Faurecia has not shown that Multimatic's posting of the designs on the VPM constituted the type of public disclosure that would jeopardize the confidentiality of the designs such that a waiver could be implied.  Moreover, the Agreement itself requires any waiver to be in writing.

Faurecia's fifth argument is that its disclosure of information to Multimatic's competitors was permitted under the Confidentiality Agreement because those competitors signed similar confidentiality agreements, thus agreeing to keep Multimatic's information confidential.  This argument ignores the purpose of the Confidentiality Agreement, which was to keep Multimatic's information from being disclosed to competitors, presumably because such disclosure could damage Multimatic's competitive position.

Faurecia's sixth argument is that the Confidentiality Agreement was "superseded" by the Letter of Intent, which contemplates Faurecia's disclosure of Multimatic's designs.  The Letter of Intent provides that "[i]n the event Multimatic fails to meet applicable quality, delivery, and product launch standards that are expected during production, Faurecia has the right to quote and source alternative production suppliers."  Although the Letter of Intent gives Faurecia the right to seek a quote under certain circumstances, Faurecia does not argue that those circumstances were actually present here – that is, that Multimatic failed "to meet applicable quality, delivery, and product

-9-

launch standards that are expected during production."  The Letter of Intent does not address the situation here, where Faurecia disclosed Multimatic's designs pre-production.  Accordingly, the Letter of Intent is not inconsistent with and does not supersede the Confidentiality Agreement.  In addition, Faurecia disclosed Multimatic's initial design before the Letter of Intent was signed, so that alleged breach is not affected by the Letter of Intent.[2]

In sum, Faurecia's arguments regarding the Confidentiality Agreement are without merit. Faurecia has admitted that it disclosed Multimatic's confidential designs and technical information, which the court finds were clearly covered by the Agreement.  Faurecia violated the Confidentiality Agreement by disclosing Multimatic's confidential information to its competitors.  Accordingly, the court will grant Multimatic's motion for summary judgment as to Count I and deny Faurecia's motion for summary judgment as to Counts I, II, and III.

### D.     The Letter of Intent

The remaining issue with respect to Multimatic's complaint is Count IV, the breach of the Letter of Intent.  Faurecia seeks summary judgment, arguing that the Letter of Intent is not a binding contract and that, alternatively, Multimatic breached first.  Multimatic contends that summary judgment is not appropriate because there are issues of fact for the jury.

"In order to form a valid contract there must be a meeting of the minds on all material facts." Ford Motor Co. v. Kahne, 379 F. Supp. 2d 857, 868 (E. D. Mich. 2005) (Cleland, J.) (quoting Heritage Broadcasting Co. v. Wilson Comm. Inc., 170 Mich. App. 812 (1988)).  Under Michigan law, a "contract to make a subsequent contract [*i.e.* an 'agreement to agree'] is not per se

---

[2] Further, as discussed below, the court finds that the Letter of Intent is not a binding agreement.

unenforceable; in fact it may just as enforceable as any other contract." Id.  However, a contract to enter into a future contract "must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations." Id. at 869 (citing Heritage, 428 N.W.2d at 787).

Faurecia contends that the Letter of Intent is not enforceable because it is merely an "agreement to agree" that does not contain all the necessary essential terms.  Although the Letter of Intent contemplates that Multimatic will be the production source for the cross-beam, it does not contain all the essential terms of a production contract.  The Letter of Intent itself reveals that the parties anticipated negotiating in the future: "Jeff Stull will distribute the production LOI for this package.  The LOI will cover the final pricing level of all negotiated engineering changes incremental to the above pricing.  In addition the LOI will contain the SOR, Quality Agreement and General Terms of Purchase and other pertinent program deliverables."

Based upon the plain language of the Letter of Intent, no reasonable jury could conclude that the parties agreed to all the essential terms and left none for future negotiations.  Therefore, the court finds that the Letter of Intent is not enforceable.  The court will grant summary judgment in favor of Faurecia on Multimatic's Count IV.

**E.      Faurecia's Counterclaim**

Faurecia filed a seven-count countercomplaint, mostly alleging variations on breach of contract and tortious interference theories.  Multimatic seeks to have all of Faurecia's counterclaims dismissed because Faurecia failed to disclose any evidence relating to its damages.

Faurecia's initial disclosures did not include an estimate or calculation of its damages; Faurecia stated that "additional discovery and the input of experts will be required to calculate an exact amount of damages claimed."  In interrogatories, Multimatic requested that Faurecia provide

-11-

a calculation of damages. Faurecia objected to the interrogatory as "premature" and stated that "[a]ll such calculations will be addressed by the experts in their reports, which reports will be exchanged by September 15, 2006."

On September 15, 2006, Faurecia informed Multimatic that it would not be submitting an expert report regarding damages. Multimatic then emailed Faurecia on September 19, requesting that Faurecia supplement its answers to interrogatories to provide a calculation of damages. Faurecia apparently did not respond and did not supplement its answer to Multimatic's interrogatory regarding damages. Discovery closed on December 29, 2006.

Multimatic contends that because Faurecia has failed to present evidence of damages, and because damages are an essential element of each of Faurecia's claims, the court must dismiss Faurecia's counterclaim. Faurecia responds that it does not need experts to establish its damages, but only the "simple application of basic math principles to a small sampling of the documents exchanged between the parties. . . ." Faurecia then proceeds to calculate its damages for each claim.

The problem with Faurecia's response is that the time for calculating damages and disclosing its theory on damages was long ago. Faurecia was required to calculate its damages in its initial disclosures or in response to Multimatic's interrogatory, which Multimatic reminded Faurecia to supplement. Instead, Faurecia blindsided Multimatic by calculating its damages for the first time in response to Multimatic's motion for summary judgment.

Fed. R. Civ. P. 37(c)(1) provides:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a

hearing, or on a motion any witness or information not so disclosed.
. . .

"The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." <u>Dickenson v. Cardiac & Thoracic Surgery of Eastern Tenn.</u>, 388 F.3d 976, 983 (6th Cir. 2004) (citation omitted). Faurecia has offered no justification for its failure to disclose information regarding its calculation of damages. This failure is not harmless, but is prejudicial to Multimatic, given that discovery is closed and trial is scheduled for March 20, 2007.

The court will not permit Faurecia to use evidence of its damages, either at trial or in response to Multimatic's motion. Having no evidence of damages, Faurecia cannot prevail on its claims as a matter of law. The court will grant summary judgment on Faurecia's counterclaims in favor of Multimatic.

### ORDER

IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment on Count I [docket # 84] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment on Faurecia's counterclaims [docket # 83] is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment [docket # 85] is GRANTED IN PART and DENIED IN PART, consistent with this opinion.

s/John Corbett O'Meara
United States District Judge

Dated:  February 26, 2007

-13-

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, February 26, 2007, by electronic or ordinary mail.

s/William Barkholz
Case Manager